**NEW YORK CENT. R. CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).**

(District Court, N. D. New York.   August 31, 1925.)

No. 640.

1. **Courts** ⊜⊐96(1)—**Ruling of New York courts that Public Service Commission had no authority to order railroad to operate canal terminals owned by state, which Supreme Court declined to disturb, will be accepted in federal court.**

Ruling of New York courts that Public Service Commission was without authority to make order requiring railroad to operate canal terminals owned by state, which Supreme Court, by denying certiorari, declined to disturb, will be accepted in federal court.

2. **Commerce** ⊜⊐85—**Interstate Commerce Commission held without authority to order railroad to operate state-owned canal terminals, where only substantial party to proceeding was state of New York (Interstate Commerce Act, § 6, par. 13, as amended [Comp. St. Supp. 1925, § 8569]).**

Interstate Commerce Commission held without authority under Interstate Commerce Act, § 6, par. 13, as amended (Comp. St. Supp. 1925, § 8569) to order railroad to operate canal terminals owned by state, where only substantial party to proceeding was state of New York, since statute requires that there shall be two carriers before commission, both subject to its jurisdiction.

Cooper, District Judge, dissenting.

In Equity. Bill by the New York Central Railroad Company against the United States, wherein the Interstate Commerce Commission intervened. On motion for an interlocutory injunction. Granted.

The state of New York owns the waterway known as the Barge Canal, extending from Albany to Tonawanda, with branches to other places, connecting the Great Lakes with the Hudson river, Lake Champlain, and the Finger Lakes. The state has also constructed as an adjunct of or convenience for its canal some 57 terminals, viz. docks or wharves, with more or less transportation facilities thereupon and upon the land adjacent to such wharves. It is commonly known that these properties or activities "are great public works for the benefit of all the people." They are "functions exercised by the state solely for the public welfare. The state has made a great public highway, which can be used free for transportation purposes, and while the state does not own the boats for carrying merchandise, it controls and manages the canal. * * * The object of the terminals is to allow persons using the canal to make proper connection with the railroads or boats for the further transportation of their cargoes." Per Kellogg, P. J., People v. Public Service Commission, 198 App. Div. 436, at page 443, 191 N. Y. S. 636, 641.

Among these terminals thus belonging to the state of New York is one at Erie Basin in the city of Buffalo. Here the state has about seven acres of land between the canal and Rock street, and on the other side of this street is the right of way and main line tracks of the petitioner herein, a New York corporation. Upon its property the state has constructed what from the meager evidence is a sort of freight yard; i. e., it has constructed tracks, switches, and the like, so that it would be possible to deliver goods ex railway cars from any part of the country alongside barges, and similarly to receive from barges directly into railway cars goods destined anywhere by rail.

This is physically possible, because there is a track across Rock street connecting the New York Central tracks with those of the state. This physical connection was made some years ago by agreement between the proper state authorities and the Director General of Railways. The state of New York, however, does not wish to operate, or at any rate never has operated, this terminal yard by any force of its own employees. So far as appears, it has no cars, engines, or employees for that purpose; so that, while it has for several years been possible physically to transfer goods from terminal to main line tracks, it has not been done, because the state would not operate its own terminal and the railroad was not willing to operate the terminal for it. It is recognized that this condition is more or less like that existing at other of the Barge Canal terminals.

The state first applied to the Public Service Commission of New York (Second Department) for an order requiring the railway to furnish the rolling stock and men necessary "to render the terminal tracks of the connection available for traffic." The commission made such an order June 24, 1920. Thereupon the railway duly applied by certiorari for the vacation thereof, and the Supreme Court of the state held that, inasmuch as the freights which the railway was required by the order in question to carry over the connection and over the tracks at said Erie Basin were interstate commerce, jurisdiction to make such an order as that complained of had passed to the Interstate Commerce Commission since the passage of the Transportation Act of 1920 (Comp. St. Ann. Supp. 1923, § 10071¼ et seq.). It followed that the Public Service

Commission was without authority to make the order in question, and such order was vacated. People, etc., v. Public Service Commission, 198 App. Div. 436, 191 N. Y. S. 636. This decision was affirmed without opinion in 232 N. Y. 606, 134 N. E. 590, and the Supreme Court of the United States refused to interfere by denying certiorari in 258 U. S. 621, 42 S. Ct. 314, 66 L. Ed. 795.

Thereupon, and on or about March 1, 1923, the state of New York, by its superintendent of public works, filed with the Interstate Commerce Commission what it called a "complaint for failure to render service under section 6, subdivision 13, of the Interstate Commerce Act." This document set up most of the facts hereinabove recited, and added in substance that the railroad's lines reached industries in and around Buffalo and interchanged traffic with railroads serving the region and under the jurisdiction of the Commission. The only method of interchanging traffic between the Barge Canal and such industries and railways was over the New York Central tracks, but that company had refused, and continued to refuse, "to interchange any traffic with the terminal." It was further asserted that "the character of the traffic attempting to move but prevented by" the railroad company was ."largely interstate." Therefore the state of New York prayed for an order, which the Commission subsequently granted on December 9, 1924.

This order is in terms granted in a case in which the only petitioners or plaintiffs are the state of New York and its superintendent of public works; but it appears that two corporations (Rochester Terminal & Canal Corporation and Inter-Waterways Line, Inc.) filed a petition declaring that they were "common carriers operating canal boats, tugs, and other equipment for the transportation of goods, wares, and merchandise upon the Barge Canal of the state of New York," and further that it was "essential to their business that they should be able to interchange traffic with the defendant New York Central Railroad Company, since they had no other means of reaching carriers by rail in the Buffalo switching district at the Erie Basin terminal, except from the lines of the defendant." Therefore these two concerns prayed leave to intervene and "to be treated as parties hereto." This prayer the Commission granted. The interveners filed no further pleading, and official or agent of each testified before the Commission, apparently at the instance of the state of New York. This was the extent of their intervention. The order passed is as follows:

"It is ordered that the above-named defendant provide, on or before May 1, 1925, and thereafter maintain, subject to the usual tariff provisions with respect to the opening and closing of navigation on the canal, a transportation service between the Erie Basin Barge Canal public terminal, in the city of Buffalo, state of New York, and points and shippers located on said defendant's line, and on lines of its connections, and perform upon the standard gauge railroad tracks within said terminal and connected with said defendant's tracks the operating service necessary to an interchange of traffic with Barge Canal lines at said terminal, the said services to embrace all traffic, interstate and intrastate, that may be transported to or from said terminal over said defendant's line.

"It is further ordered that said services shall include the furnishing, by said defendant, of all railroad cars necessary for the transportation of said traffic between the terminal and the points and shippers aforesaid, and the operation, by said defendant, with its own motive power and servants, upon the said railroad tracks within said terminal, of all such railroad cars, loaded and empty, going to or coming from said terminal, including the spotting, placing, and removal of such cars therein and therefrom."

This petition or bill in equity was filed for the purpose of obtaining a decree forever enjoining the operation or execution of said order. The usual motion for an interlocutory injunction was made, and came on to be heard on May 2d, 1925, pursuant to an order to show cause with stay theretofore issued. At the hearing of said motion for preliminary injunction, and in open court, it was agreed that, since no other or further testimony was contemplated by any party, except such as had already been adduced before the Interstate Commerce Commission, the testimony and exhibits so offered and introduced before. the Commission should be filed in this court, and the court proceed to a final hearing in this cause.

Parker McCollester, of New York City (Charles C. Paulding and Clyde Brown, both of New York City, and Robert E. Whalen, of Albany, N. Y., on the brief), for petitioner.

Blackburn Esterline, Asst. Atty. Gen., for the United States.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Almon W. Burrell, Deputy Atty. Gen., of New York, addressed court and filed brief as amicus curiæ.

Before HOUGH, Circuit Judge, and KNOX and COOPER, District Judges.

HOUGH, Circuit Judge (after stating the facts as above). It is always advisable, and sometimes vital, to get behind the forms and formal parties of a litigation, and ascertain who is the actual person insisting on the demand in suit, what that person wants, and why it is wanted. In form this suit has nothing to do with the state of New York, but the truth is that that state is by long odds the person or party most seriously involved, and it is the maker of the essential demand herein.

Description of that demand may be approached by another quotation from the dissenting opinion of Kellogg, J., in 198 App. Div. 436, 191 N. Y. S. 641. That learned judge not only said ut supra that the state built, controlled, and managed the canal, but that it also "controls and manages the terminals" thereof, including, of course, the Erie Basin terminal in Buffalo. This was error, probably inadvertent; the state did build the terminal, it owns it, and has made of the Erie Basin terminal what may fairly be called a railroad yard. But in the sense of operating or rendering useful the railroad yard that is the important part of that terminal, it never has done, and does not intend to do, the same. This case results from an effort to make some one else do what it has declined to do.

The state of New York is not a carrier, common or otherwise. If the state should enter upon common carriage, and for that purpose acquire rolling stock, etc., it might well pro tanto lay aside its sovereignty and subject itself to the jurisdiction of mere regulatory authority, whether of its own creation, of another state, or of the nation. Georgia v. Chattanooga, 264 U. S. 472, 44 S. Ct. 369, 68 L. Ed. 796. But New York has done nothing of this kind. It did petition the Interstate Commerce Commission to grant the order now attacked, but it distinctly did not prefer that petition as a common carrier, much less as one subject to the regulatory jurisdiction of the Commission itself.

Therefore one way, and an accurate way, of putting the question before us is to inquire whether, at the request of a sovereign state, which is not a common carrier, but is beyond and superior to the regulatory or coercive power of the Commission, that body can lawfully compel a carrier undoubtedly subject to its jurisdiction to *operate* the state's property; i. e., to take over the management of the state's Erie terminal, which the state itself refuses to operate as a railroad yard.

It is here essential to state that I regard the order complained of as having been made solely on the demand and at the suit of the state of New York. The intervention (so called) of the two private corporations above named was almost farcical. Both of them averred (in their application for intervention) that they were *common carriers* of goods, etc., upon the Barge Canal. But no evidence was given that either of these concerns was or ever had been engaged in interstate commerce. On the contrary, the president of one of them deposed that his concern was "not in the interstate carrying business," and the manager of the other stated on oath that his sole interest in this proceeding was that he sometimes did not get "eastbound business (from Buffalo) because there was no service from the terminal to the industries located in the Buffalo switching district"; in other words, he sometimes failed to get some intrastate business. The substance of the matter is that no common carrier engaged or seeking to engage in interstate business asked the Commission to do what it did.

Consequently the question again arises whether the Commission could do what was done solely at the request of New York, and because (to summarize what is actually shown by the record) that state, having taken the trouble to make a freight yard alongside the Barge Canal and contiguous to the tracks of the New York Central Railroad, desired that railroad to take over and operate that freight yard *in order to attract business to its canal.*

The evidence seems to me full that, if it were made easy to transfer goods from barge to car or the reverse, business *might* be attracted to the barges; and particularly is it plain that, if some one would undertake the business of collecting goods within the Buffalo switching district and delivering them on board barges at the terminal (or reversing the process), the procedure would meet with the approval of perhaps many manufacturers and shippers doing business in Buffalo. It is a fair summary of what this order means that the plaintiff railroad shall extend its Buffalo yards, so as to make the state's terminal an integral portion thereof. Practically the railroad is commanded to enter upon the state's property and establish a freight depot, with appropriate switching and distributing service, at the canal edge.

The entire cost of this operation is laid upon the plaintiff railroad; also (so far as shown by this record) the entire cost of upkeep of terminal, tracks, etc. The charges to be made for these services seem to be at present left to be fixed by the plaintiff railroad, subject, however, to the regulatory power of the Commission.

[1] The present state of the law on this matter seems to be this: The courts of New York

have decided that the Public Service Commission of that state cannot do what the state wants, and the Supreme Court has not affirmed that ruling, but declined to disturb it; consequently we accept it. But no court has said as yet that, in a proceeding such as was actually brought by the state before the Interstate Commission, that body was empowered to give the state what it wanted. Therefore that question comes before this court for the first time. This situation may be considered from several legal viewpoints:

(1) Could the Commission do what it did (a) under the sections of the statute invoked; or (b) at the request of the state of New York only?

(2) Could the Commission lawfully require the railroad to extend its lines, by undertaking the management and operation of another's railroad property, especially when that other is a sovereign state, and not judicially compellable to respond for its own wrongs, or to maintain in operative condition the property to be managed by the railroad?

(3) If the statute does grant the Commission such powers, is such statute constitutional?

I prefer to confine present expression of opinion to the first of the above propositions. The petition presented to the Commission was specifically based on paragraph 13 of section 6 of the Interstate Commerce Act as at present amended (Comp. St. Supp. 1925, § 8569).

It is well known that this section took its present shape principally to facilitate and advantage traffic through the Panama Canal. But it is so drawn as to be of much wider import. So I cull from the statute words which seem to me fairly to express the idea which the majority of the Commission thought authorized the order now complained of. The following are the operative words of the statute:

"When property *may be* transported from point to point in the United States by rail and water, the transportation being by a common carrier or carriers and not entirely within the limits of a single state, the Interstate Commerce Commission shall have jurisdiction in the following particulars:

"(a) To establish physical connection between the lines of the rail carrier and the dock at which interchange of property is to be made. To prescribe the terms and conditions upon which these connecting tracks shall be operated (and to) determine what sum shall be paid to or by either carrier.

"(b) To establish through routes and maximum joint rates between and over such rail and water lines.

"(c) To establish proportional rates or maximum and minimum proportional rates."

The foregoing states the circumstances under which the Commerce Commission may exercise power. It is to be noted that no request was made to establish rates of any kind or routes. Nor was any request made to establish physical connection between the railway line and the dock; that physical condition exists and has existed for some years. It follows that the only statutory language covering what the Commission was asked to do and did do is the provision that "the Commission shall have full authority to determine and prescribe the terms and conditions upon which these *connecting tracks* shall be operated, and it may either in the construction or the operation of such tracks determine what sum shall be paid to or by *either carrier*."

[2] Now let it be admitted that the words "may be," supra, authorized the Commission to step in upon the mere hope or possibility that a connection will make or attract business. But it seems to me quite clear that, when the statute declares that, when it comes to directing the *operation* of tracks, a determination shall be made of what shall be "paid to or by *either carrier*," such a statute necessarily implies and plainly means that there shall be before the Commission, and both subject to its jurisdiction, two carriers. This is an impossibility when one party, and the only substantial party, before the Commission, was the state of New York.

Without pursuing the matter further, I am of opinion that plaintiff should take a decree as prayed for.

KNOX, District Judge, concurs.

COOPER, District Judge (dissenting). The Interstate Commerce Commission's order of December 9, 1924, requires the petitioner railroad to provide transportation service between the Erie Basin Barge Canal terminal in the city of Buffalo, on the one hand, and points and shippers located on said railroad company's lines and on the lines of its connections, on the other hand, and to perform upon the tracks of said terminal the operating service necessary to an interchange of traffic with the Barge Canal lines at said terminal. The order did not require the making of a physical connection between the tracks of the petitioner railroad and the tracks on the Barge Canal terminal, for the reason that the physical connection between the tracks of the petitioner railroad and the tracks on the Barge Canal terminal had been made by agreement with the state of New York, the owner of the

terminal; and the Director General of Railroads while the New York Central was operated by the government under the Director General.

The statute chiefly involved here is subdivision 13 of section 6 of the Interstate Commerce Act, which is as follows:

"(13) When property may be or is transported from point to point in the United States by rail and water through the Panama Canal or otherwise, the transportation being by a common carrier or carriers, and not entirely within the limits of a single state, the Interstate Commerce Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage in the same, in the following particulars, in addition to the jurisdiction given by the act to regulate commerce, as amended June 18, 1910:

"(a) To establish physical connection between the lines of the rail carrier and the dock at which interchange of passengers or property is to be made by directing the rail carrier to make suitable connection between its line and a track or tracks which have been constructed from the dock to the limits of the railroad right of way, or by directing either or both the rail and water carrier, individually or in connection with one another, to construct and connect with the lines of the rail carrier a track or tracks to the dock. The Commission shall have full authority to determine and prescribe the terms and conditions upon which these connecting tracks shall be operated, and it may, either in the construction or the operation of such tracks, determine what sum shall be paid to or by either carrier:

"Provided, that construction required by the Commission under the provisions of this paragraph shall be subject to the same restrictions as to findings of public convenience and necessity and other matters as is construction required under section 1 of this act."

The power of the Commission under this statute to direct the construction of a physical connection, that is, a connecting track, and the operation of such track, in an appropriate case, is not seriously challenged. The railroad company alleges that the facts shown here, however, do not make the statute operative, or, in other words, that the Commission had no jurisdiction in the instant case. This is based chiefly on the contention that there were no interstate water common carriers before the Commission.

Two water carriers intervened in the proceeding, viz. Rochester Terminal & Canal Corporation and Interwaterways Line, Inc.,

by a petition which appears in the record. The Commission held that their intervening petition was regular and in accordance with its rules. The Commission was authorized to make its own rules, and was competent to determine that the intervention was in accordance with such rules. The court should be concluded by the Commission's determination. For this court to hold otherwise would almost usurp the power of the Commission to make and interpret its own rules.

The interveners described themselves as common carriers in their intervening petition, and the Commission so found. The fact that they did not file a schedule of rates, or tariff of charges, with the Commission, is not serious. A plea of nonfiling would not be available as a defense in an action against them. Assuming that the court is not bound by the determination of the Commission as to the character of these water carriers, the evidence is sufficient to show that they are common carriers transporting freight moving in interstate transit.

Even if none of the boats of the intervening water carriers themselves move interstate, or transport freight which moves in interstate transit, nevertheless the rail carrier is an interstate carrier, and the statute would be satisfied by the carrying of freight which crosses the state line on the defendant railroad's cars and passes through this terminal for water transportation for points in the state of New York having water connections. It would also be satisfied with shipments originating in New York state carried by water carrier to the terminal in question and then transported over the railroad lines to other states.

One of the plain purposes of the federal statute is the supplying of facilities for the exchange of interstate water and rail traffic where no such facilities now exist, or, in other words, for the promotion of interstate commerce by compelling interchange between rail and water carriers, one or both being engaged in interstate commerce. Of course, there can be no interstate or other commerce by rail and water carrier through this terminal, if no one operates the connecting tracks on the terminal. It is clear, however, that there is potential interstate commerce at this point. The statute does not require the present existence of such interstate commerce by rail and water carrier or carriers. The statute is satisfied if there "may be" such commerce. There being potential rail and water interstate commerce through this terminal, and a physical connection between the lines of the rail carrier and the tracks on the terminal dock, to which the water carrier has access, it was within the

power of the Interstate Commerce Commission to require the connection and the tracks on the terminal to be operated by the rail carrier.

The very ground of the decision in the state courts was that the potential traffic through this terminal was interstate, in part, at least, and therefore the Interstate Commerce Commission, and not the Public Service Commission of the state, had jurisdiction. People ex rel. N. Y. Central v. P. S. Com., 198 App. Div. 436, 442, 191 N. Y. S. 636, affirmed 232 N. Y. 606, 134 N. E. 590, without opinion.

The rail carrier is inconsistent in contending in this court that there is no interstate commerce, even potential, which would pass through this terminal, and that therefore the Interstate Commerce Commission had no jurisdiction to make the order in suit, after prevailing in the state courts on the ground that there was interstate commerce, and that therefore the state Public Service Commission had no jurisdiction.

True, the terminal dock and the tracks thereon, including the connecting track, belong to the state of New York; but the state of New York is not a common carrier (People ex rel. N. Y. Central v. Pub. Ser. Comm., supra), and it has no equipment for the operations specified in the order of the Interstate Commerce Commission. If the terminals and tracks thereon are part of the canal system of the state, then the state, if it could render such transportation service, would be required to render the service gratis, for section 9 of article 7 of the state Constitution prohibits the imposing of "tolls" on persons or property transported on the canals.

The act under which the funds for the Barge Canal terminals and tracks thereon were authorized, the terminals and railroad tracks constructed, and their use regulated, in substance puts these canal facilities, along with the canals of the state, under the jurisdiction of the canal board of the state. Chapter 746, of the Laws of 1911, approved by referendum of the people of the state.

Water carriers are not usually equipped to operate railroad tracks. It follows, therefore, that, if the connection here is to be operated at all, it must be by the petitioner railroad, which is equipped for such operation.

Even if this be viewed as an order which compelled the rail carrier to extend its tracks, to which view the writer does not subscribe, nevertheless by other sections of the same statute such power resides in the Commission. This power is contained in paragraph 21 of section 1 of the act (Comp. St. Supp. 1925, §

8563). Such of the cases cited by counsel for the railroad company, on the theory that the order of the Commission requires an unlawful extension of its tracks, as were decided since the act in question, are not in point, and the physical situation in the cases cited is clearly distinguishable from the situation in the instant case. The prior cases, of course, can have no bearing.

The requirement that such extension could not be made, unless the Commission should find that it was in the interest of public convenience and necessity, is met by the finding of the Commission to that effect. That the petition was originally made by the representative of the state of New York, having certain duties relating to the Barge Canal, is not serious. There were intervening water common carriers, and the proceeding might have been instituted in the first instance by the Interstate Commerce Commission of its own initiative, under section 13 of the act in question (section 8581 (2) of the Compiled Statutes).

The fact that in the order under consideration the Commission has made no provision for the payment of any sum by the water carrier to the rail carrier is unimportant. There is no construction cost to be apportioned. The operation cost will presumably be paid by the shipper. Thus there will apparently be nothing to be paid by the water carrier. If, in the course of the operation of the connection, undue expense to the rail carrier results, the jurisdiction of the Commission to apportion some part thereof upon the water carrier, by means of rates, or otherwise, remains to be made effective at any time.

The lack of a provision in the order fixing the rates to be charged for the service is of no moment here. If the rates charged by the railroad shall be deemed excessive, it is within the power of the Interstate Commerce Commission to fix the rates, and to apportion the expense of operating the connection between the rail and water carrier in the fixing of through rates.

The question of subjecting the railroad company to liability for damages arising from operating the tracks upon the property of the state is not a serious one in the determination of the matter now before the court. The state maintains its canals, and no assumption can fairly be made that it will not properly maintain its canal terminals. The contract for the construction and operation of the terminal tracks in question between the state and the Director General of Railroads, while the railroads were operated by the federal government, expressly provided that the state should

maintain the tracks on this terminal. This contract is probably not now in effect.

Even if the state should not properly maintain this terminal, and the tracks should become dangerous to operate, such tracks might well be maintained by the railroad, and if not collectible from the state, the expense of such maintenance, like the expense of maintaining its· own right of way, might become an important factor in the fixing of the rates to be charged for the service, and may also be apportioned between the rail and water carriers.

Moreover, the jurisdiction of the Interstate Commerce Commission· is continuous, and it may, from time to time alter or modify the terms on which the connection shall be operated. If the state should not maintain its terminal tracks, the Interstate Commerce Commission has the power to rescind its order, if the service required would, because of nonmaintenance by the state, be unduly burdensome to the railroad, or to the water carriers, or to both.

No presumption may be indulged in that the railroad will not be treated fairly by the Commission.

The writer is unable to agree with the majority of the court, and holds that the order was within the jurisdiction of the Interstate Commerce Commission, and that the injunction should be denied.